UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:03CV768-H

NORMAN WRIGHT                                                            PLAINTIFF

V.

LOUISVILLE JEFFERSON COUNTY
METRO GOVERNMENT, et al.                                        DEFENDANTS

## MEMORANDUM OPINION

Plaintiff, Norman Wright, claims that Defendant, Travis Hatchell, used unreasonable force during a police raid at an apartment and that Defendant, Louisville/Jefferson County Metro Government, was negligent in its hiring and training, each of which violates 42 U.S.C. § 1983. This is an unusual case:  Plaintiff was a visitor at the apartment of a friend; he was the accidental victim of police gun shots directed toward a dog also present in the apartment; and whether or when a seizure actually occurred for purposes of a Fourth Amendment claim is difficult to determine.  Defendants have moved for dismissal on qualified immunity grounds as well as summary judgment.  For the reasons that follow, the Court concludes that under any of the potential methods of analysis, Defendants are entitled to their requested relief.

I.

Plaintiff is a thirty-year-old native of Louisville.   On the morning of February 21, 2003, he visited the home of a friend, Antoin Abell, who lived in the Arcadia Apartments, off Six Mile Lane near Breckinridge Lane.  Also present in the apartment besides Plaintiff and Mr. Abell

were Mr. Abell's infant daughter and his seven-month-old pit bull puppy.[1]

Travis Hatchell had been employed with the Louisville Police Department for seventeen years.  On the morning in question, Hatchell and the other SWAT team members met to execute a search warrant on Mr. Abell's home.  They considered the raid to be high-risk because Mr. Abell was suspected of being involved in narcotics and possibly armed.  Plaintiff was not the target of this search warrant.  Indeed, the SWAT team did not know in advance of Plaintiff's presence.

Prior to the service of the warrant, Lt. Mike Schellenberger briefed the SWAT team. The members knew the layout of the apartment, the reason for the service of the warrant, and that a small child was likely present.  Hatchell did not remember being told that a dog would be present.  However, the other SWAT members were apparently aware that a dog was present at the location.  In fact, Hatchell told investigators that he and another detective, Scott Frank, discussed what each would do if confronted by a dog and that Frank explained to Hatchell that he would confront the dog if it was aggressive.

About ten Metro SWAT team officers were involved in the initial entry into Mr. Abell's apartment.  Hatchell was second in the "stack," behind Detective Frank.  Immediately upon entry, Frank went to the left to confront Mr. Abell, who was sitting on a couch in the middle of the living room feeding his infant daughter.  Detective Frank told Mr. Abell to "get your child," a command with which Mr. Abell complied.

The remaining sequence of events culminating in the shooting probably took no more

---

[1] Plaintiff refers to the animal as a "puppy;" Defendant refers to him as a "pit bull."  The animal appears to be both and weighs between 40-50 lbs.  To be perfectly neutral the Court will simply refer to the animal as "the dog."

than 30 seconds.  After Detective Frank turned to the left, Hatchell immediately focused his attention on Plaintiff, who was sitting in a La-Z-Boy chair at the back of the room.  Hatchell says that the team members shouted various commands upon entry.  The officers repeatedly yelled "police, search warrant" and "get down, SWAT, get down."  Specifically, Hatchell screamed "get down, get down, get down, police, get down, search warrant" as he approached Plaintiff.

There is some discrepancy over when and where the officers first encountered Mr. Abell's dog.  Hatchell testified that the dog met the "stack" at the door to the apartment.  The dog then ran towards the rear of the residence.  However, according to Plaintiff, the dog was sleeping upstairs and came down after the officers had entered, stopping near the back of the room.  This particular dispute is quite immaterial.  At some point, Hatchell was also yelling at Plaintiff to "get the dog, get the dog, get the dog."  Other officers simultaneously yelled at Plaintiff to "control the dog" and "get down."

Plaintiff says that he heard several officers screaming "shoot it, shoot it."  He did not comply with any of the officers' conflicting orders to get down or control the dog.  His hands were up and "he wasn't aggressive at all."  Plaintiff says that he was scared and did not want to make any sudden movements.

The subsequent events occurred within seconds and in the context of a generally chaotic atmosphere.  Hatchell gave his version of the events.  The dog was about five feet away.  He then approached to within one-and-one-half or two feet.  At this time, Hatchell was within arm's reach of Plaintiff.  The dog was facing them, closer to the sliding glass doors at the back of the apartment.  He lunged at Hatchell, then stopped and walked backwards and arrived within one foot of the spot where it was before its first approach.  He lunged a second time, this time

3

possibly getting a little closer to Hatchell than during the first lunge.  Once again, the dog stopped, walked backwards, and returned to the same general area it was in before its two previous approaches.  After the dog returned to its original spot after the second lunge, Hatchell grabbed Plaintiff's left shoulder with his right hand and pulled him on the ground.  Plaintiff complied, went straight to the ground and went limp.  Upon going to the ground, Plaintiff was positioned on his left side and his legs were straight out towards the rear of the apartment, parallel with the right wall.  His head was within one foot of Hatchell's boots.  Hatchell was closer to the front door than either Plaintiff or the dog.  Plaintiff was placed between the dog and Hatchell, although the dog was a few feet off to the left side away from the chair.

As soon as Hatchell grabbed Plaintiff and started to bring him to the ground the dog came at Hatchell on a "dead run."  On this third approach, the dog was moving much faster and was more in "attack" mode.  Hatchell decided to shoot it.  Plaintiff and his legs were still moving to the ground when the dog began his final approach.  Hatchell shot at the dog with a three-round burst.  However, he hit Plaintiff rather than the dog.  Hatchell testified that the dog was one-and-one-half to two feet to the left of Plaintiff's body and within four or five feet of Hatchell when he shot at it.  According to Hatchell, the entire time from the initial entry into the apartment to the firing of his service weapon was approximately thirty seconds.

According to Plaintiff and Mr. Abell, the dog never advanced or acted aggressively towards any of the officers.  It was sitting on its hind legs, barking and moving away from the officers.  Hatchell got Plaintiff to the ground and pushed Plaintiff's neck and upper shoulder with his feet.  As he shot, Hatchell was attempting to move Plaintiff's upper body, but his legs were still touching the floor.

4

Upon being hit, Plaintiff screamed out in pain and fell onto the furniture.  The dog immediately ran up the stairwell to the second floor.  Hatchell and other members of the team followed it.  However, the dog quickly ran back down the stairs, past every single officer and EMT in the residence, and out of the apartment.  No further confrontation occurred.  Plaintiff was immediately admitted to the hospital, where he remained for three or four days.  Plaintiff's foot is now deformed and his left foot requires a size fourteen extra-wide shoe rather than his pre-shooting size of eleven or twelve.

## II.

Whether or not a particular action constitutes a seizure is a question distinct from whether the actual force used violates constitutional protections.  Plaintiff claims that Hatchell used excessive force during the course of an arrest or seizure.  The Supreme Court has held that such claims are to be analyzed under the "objective reasonableness" standard of the Fourth Amendment.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  Defendants argue that the circumstances are more appropriately analyzed under the more difficult to meet Fourteenth Amendment substantive due process standard which requires governmental conduct that "shocks the conscience."  *County of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998).  The Court must first determine which standard applies in these circumstances.

The Court can find no reported case that answers the precise questions raised here.  In most cases, the police officer who seizes a plaintiff also exercises force against him.  In those circumstances, the alleged excessive force is also the act of seizure.  Here, neither of these is precisely true, thus requiring an analysis that does not fit the usual case.

5

A.

Usually, one would assume that Hatchell seized Plaintiff at the time of the shooting. Indeed, Defendants contend that if a seizure occurred at all, it did not occur until Hatchell's weapon discharged, inadvertently injuring Plaintiff. This is a reasonable and also clever argument. For as the Court's analysis demonstrates, such an act could not alone form the basis of a Fourth Amendment claim. For the reasons that follow, the Court rejects Defendant's argument.

The Supreme Court has often said that a seizure requires an intentional act by the party effecting the seizure:

> [A] Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement . . ., nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement. . ., but only when there is a governmental termination of freedom of movement *through means intentionally applied.*

*Brower v. County of Inyo,* 489 U.S. 593, 596-97 (1989). The *Brower* court also said that a Fourth Amendment seizure occurs when a person has been "stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Id.* at 599. The rationale for this rule is that Fourth Amendment protections are thought to apply to unreasonable seizures, not negligent ones. The Constitution is simply not implicated by accidental events, no matter how serious the consequences. For example, the accidental firing of a weapon that injures someone does not constitute a seizure. *Cf. Lewis*, 523 U.S. at 846-47 (on different facts, accidentally inflicted injuries do not constitute seizures). The intentional firing of a weapon that accidentally injures an innocent bystander is not a seizure. *Claybrook v. Birchwell,* 199 F.3d 350, 359 (6th

6

Cir. 2000).[2]

Because Hatchell did not intend to shoot Plaintiff, the shooting alone cannot constitute a seizure. Moreover, the Fourth Amendment does not protect against negligent or accidental consequences of acts not intended to cause a seizure. Plaintiff's seizure must occur prior to the shooting for his claim to be cognizable under the Fourth Amendment. *See Lewis*, 523 U.S. at 844-45 n. 7; *Dunigan v. Noble*, 390 F.3d 486, 492 (6th Cir. 2004).

The Court must next determine whether any other circumstances here constitute a seizure and whether Plaintiff may bring a Fourth Amendment claim where the injurious act itself was not intended to cause a seizure.

## B.

A Fourth Amendment seizure occurs only when, "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (quoting *Michigan v. Chesternut,* 486 U.S. 567, 569 (1988)). "[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Chesternut*, 486 U.S. at 573. A consensual encounter becomes a seizure when "in view of all the circumstances surrounding the incident, a

---

[2] It is important to distinguish such cases from those in which the seizure occurs prior to the accidental firing of the weapon. In those cases, the actual firing of the weapon is not relied upon to constitute a seizure. *See Tallman v. Elizabethtown Police Dept.*, 344 F.Supp.2d 992, 995 n.5 (W.D. Ky. 2004)(where the Court determined that seizure occurred prior to the accidental shooting); *see also Pleasant v. Zamieski*, 895 F.2d 272-73 (6th Cir. 1990); *Leber v. Smith*, 773 F.2d 101, 102 (6th Cir. 1985) (where the seizures appear to have occurred just prior to the accidental shootings). Also, this is not a case where officers fire at a fleeing automobile and are said to have intended to seize the entire vehicle and everyone in it. In such cases, a seizure is said to have occurred even as to passengers only accidently injured or killed. *Fisher v. City of Memphis*, 234 F.3d 312, 318-19 (6th Cir. 2000).

reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

In *Mendenhall*, the Supreme Court described several factors relevant to finding a seizure. These factors include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* at 554. In fact, in one set of circumstances the Sixth Circuit noted that an individual was "seized" for Fourth Amendment purposes given the position of the squad cars in relation to the defendant's and the commands the officers had given to him.

> The conduct of the police officers also demonstrates that a seizure occurred as soon as they approached Gilchrist's vehicle. The police officers did not ask Baldwin or Gilchrist to merely answer some questions. Rather, Coombs sought to determine if either of the two men had heard any gunfire, whereas Blackwell demanded that Gilchrist exit the vehicle. The police officers' tone and compulsory language suggest that they expected Baldwin and Gilchrist to answer their questions and fully comply with their demands.

*United States v. Baldwin*, No. 03-4139, 2004 WL 2591245, at *3 (6th Cir. Nov. 12, 2004).

In virtually every respect, the search of Mr. Abell's apartment presents a similar picture. The officers no doubt intended to take control of the apartment and everyone present in order to carry out their search. To accomplish this objective the officers invaded the apartment, displayed weapons and used commanding language that required compliance. Wright felt threatened and restrained. He reflexively raised his hands in surrender. No doubt he held the reasonable belief that he was not free to leave. During the moments immediately prior to the shooting, he was not free to leave. Thus, the overall circumstances squarely meet the

8

*Mendenhall* criteria for a seizure.

Even lesser actions directed specifically toward Wright could constitute a seizure.  By commanding Wright to go to the ground and physically grabbing him, the officer appears to have "terminat[ed his] freedom of movement *through means intentionally applied*."  *Brower*, 489 U.S. at 597 (emphasis in original).  The Sixth Circuit has recently held that a mere push of a bystander was a seizure for Fourth Amendment purposes.  *Dunigan*, 390 F.3d at 493.  There, the police were attempting to execute a warrant for the arrest of the plaintiff's son.  During the course of the "chaotic" scene, the first officer pushed her out of the way, causing her to stumble.  A police dog belonging to a second officer inadvertently attacked her.  The Sixth Circuit held that she was "seized" by the first officer who pushed her, though not by the second officer.   *Id.*[3]

Based upon this analysis, the Court concludes that prior to the shooting, Hatchell and the others effected a seizure of Wright for purposes of a Fourth Amendment § 1983 claim.  It hardly needs be said that up to that time the degree of force used in doing so was entirely appropriate.

## C.

The actions constituting seizure may not have ended, however.  The continuation of it confronts the Court with two somewhat contradictory findings: (1) under the totality of the circumstances Plaintiff was seized and (2) Hatchell subsequently used force directed other than toward Plaintiff that injured him accidentally.  On one hand, the first finding does not necessarily

---

[3] At first blush this analysis may seem at odds with *Ewolski v. City of Brunswick*, 287 F.3d 492, 507 (6th Cir. 2002), where the court found no seizure of two persons who were innocent participants to a police attack because they had "no reason . . . to believe that the police were preventing them from leaving the house." The Court stated that "the fact that the police exercised control over the environment in the Lekan's house does not demonstrate that Mrs. Lekan and her son were seized."  *Id.* at 507.  These are close cases.  However, the difference between the two is that in *Ewolski*, the police never actually gained control of the house until everyone inside was shot.  In our case, the officers were inside and all the parties restrained prior to the shooting.

bring this case within the Fourth Amendment.  The fact that someone is seized, and later injured, does not necessarily implicate the Fourth Amendment.  On the other hand, the second finding, while more problematic, does not necessarily take this case out of the Fourth Amendment. Indeed, that Hatchell did not physically aim the force at Plaintiff makes the applicability of the Fourth Amendment here a serious question.  As noted in section "II. A," *supra*, cases have held that the Fourth Amendment usually does not cover the claims of those injured by errant gunshots.  *Claybrook v. Birchwell,* 199 F.3d 350, 359 (6th Cir. 2000); *Fisher v. City of Memphis*, 234 F.3d 312, 318 n. 3 (6th Cir. 2000) (discussing *Claybrook* and other cases).  This is so because errant  gunshots are not calculated to seize innocent hostages or other innocent bystanders.  Nevertheless, shooting at the dog, while not directly aimed at Plaintiff, was in all respects related to seizing Plaintiff and the other occupants of the apartment.  This is not a case like *Claybrook* in which an errant gunshot struck an individual who was otherwise not subject to seizure.

Under our facts, it is unrealistic to permit a few seconds in time to analytically separate the actual seizure from Hatchell's discreet act of shooting at the dog.  As a practical matter, all of the police activities within the first thirty seconds or so upon entering the apartment were designed to gain control over those present: asserting control over the apartment; requiring all present to raise their hands or to remain still; pulling Plaintiff out of harm's way; and firing at the dog.  Though Plaintiff was already seized, Hatchell's actions toward the dog, within a few seconds of it, were part of the same effort to secure and maintain control.  Case law does not convince the Court that these unusual factual circumstances take the case out of the Fourth Amendment.

For these reasons, the Court concludes that Plaintiff's claim is best analyzed under the Fourth Amendment.[4]

III.

Because reasonable minds might differ whether this case is properly analyzed under the Fourth Amendment or the substantive due process clause of the Fourteenth Amendment, the Court will review each.  The short digression for the due process analysis presents few difficulties.

The substantive component of the due process clause insulates citizens against the arbitrary exercise of government power.  Conduct of a law enforcement officer towards a citizen which "shocks the conscience" denies the victim fundamental substantive due process.  *See Lewis*, 523 U.S. at 844 (where the Supreme Court found that constitutional tort claims asserted by persons collaterally injured by police conduct who were not intended targets of the attempted official "seizure" are analyzed under the substantive due process standards.)

In situations where the law enforcement officers are afforded a reasonable opportunity to deliberate various alternatives to action, their actions will be deemed conscience-shocking if they were taken with deliberate indifference towards the plaintiff's federally protected rights.  *Id.* at 850.  On the other hand, in a rapidly evolving, fluid, and dangerous predicament which precludes the luxury of calm and reflective, pre-responsive deliberation, public officers' reflective actions "shock the conscience" only if they involve force employed "maliciously and sadistically for the

---

[4] *Cardona v. Connolly*, 361 F.Supp.2d 25 (D.Conn. 2005) may take the opposite view.  Plaintiff was already under arrest where a police dog bit her.  The court held that the bite did not constitute a seizure because the officer did not intend for the dog to attack.  *Id.* at 34.  This Court believes that the case deserved a Fourth Amendment analysis because the plaintiff was in custody and the dog bite was temporally and otherwise related to that custody.  Nevertheless, a Fourth Amendment analysis would have produced a similar result.

very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline." *Id.* at 853 (quoting *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)); *Claybrook*, 199 F.3d at 359. Our case has much in common with *Claybrook's* Fourteenth Amendment analysis. There, the Sixth Circuit held that a substantive due process claim would not lie where the police had inadvertently inflicted injuries upon an innocent third party. The *Lewis* court held the same on facts involving a high speed motorcycle chase, which led to the accidental death of the pursued motorbike's innocent passenger, prompted by unforeseen circumstances which demanded the officer's instant judgment.

The circumstances of our case similarly demanded Hatchell's instant judgment. No one disputes that Hatchell intended to direct force upon the dog and not upon Plaintiff. While a reasonable jury could well conclude that Hatchell acted negligently, none of the facts in this case suggest that Hatchell acted with conscience-shocking malice toward the unintended victim, Wright. Consequently, Plaintiff cannot possibly pursue a § 1983 action alleging violation of his substantive due process rights.

IV.

The analysis of Plaintiff's excessive force claim under the Fourth Amendment's objective reasonableness standard under *Graham v. Connor*, 490 U.S. 386 (1989) presents a great deal more uncertainty. The first problem is to identify the precise force that is subject to review.

In many respects, our analysis is parallel to that in *Pleasant v. Zamieski*, 895 F.2d 272 (6th Cir. 1990). There, a police officer's weapon accidentally discharged during a chase, killing the plaintiff. The jury returned a defendant's verdict. The plaintiff appealed on the grounds that he was entitled to a judgment notwithstanding the verdict. In *Pleasant*, the officer's intentional

act of force was to draw his weapon and then to keep it unholstered during the chase.  Here, Hatchell's intentional act of force was to fire at a dog he perceived as a threat.  In each instance, the intentional act resulted in an unintended injury.  However, the Court determines the objective reasonableness of each officer's action based upon the intentional act rather than upon the unintended consequence.  Consequently, whether Plaintiff may maintain a constitutional claim depends on the objective reasonableness of Hatchell's decision to fire at the dog.[5]  The accidental and unintended consequence of that action was injury to Plaintiff.  As in *Pleasant*, the analysis in our case would be no different had Hatchell's actions caused Plaintiff's death rather than merely an injury to his foot.

     Since no precise definition of "reasonableness" exists in a vacuum, the Supreme Court has cautioned that proper analysis requires careful attention to the facts and circumstances of a particular case.  *Graham,* 490 U.S.. at 396.  Because the facts here are disputed, the Court's analysis of the Fourth Amendment claim is constrained by the potential factual findings of a reasonable jury.  Summary judgment is proper only where there is no dispute as to a material question of fact and one party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of a nonmoving party and draw all reasonable inferences in favor of that party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which evidence is more credible; rather, credibility determinations are left to the fact finder.  Here, the Court must

---

[5] For example, in *McCoy*, the Eighth Circuit considered an accidental gun firing and observed that "the relevant inquiry is not whether Ouellette's act of firing his gun was 'objectively reasonable,' but whether, under the totality of the circumstances, his act of drawing his gun was 'objectively reasonable.'" *McCoy v. City Monticello*, 342 F.3d 842, 848 (8th Cir. 2003).

review all the facts and inferences drawn from the evidence and determine what factual findings a reasonable jury might reach.

The respective descriptions of events are quite similar.  Hatchell said the dog was growling; the others say it was barking.  Hatchell says that the dog lunged back and forth several times and then began running at him.  Others only saw the dog moving backwards.  Everyone agrees that the dog was within four to five feet of Hatchell.  This proximity is close enough for anyone to perceive a threat.  No one can dispute that the chaos of the police assault and the presence of the barking dog required Hatchell to make an immediate decision without an opportunity for calm reflection.  No one disputes that Hatchell attempted to pull Plaintiff out of the dog's path and out of any potential line of fire.  No one disputes that Hatchell attempted to shoot the dog and to avoid hitting others.

Under such circumstances, some minor factual discrepancies are to be expected.  Those discrepancies do not necessarily create material issues of fact that prevent the Court from reaching dispositive conclusions.  *See Gaddis v. Redford Township*, 364 F.3d 763, 773 (6th Cir. 2004) (where Chief Judge Boggs found that conflicts of perception may not create a material dispute of fact as to the officers' credibility) (citing *Anderson v. Russell*, 247 F.3d 125, 130-131 (4th Cir. 2001)).  Indeed, the witnesses' primary disagreement here concerns their respective perceptions of the threat posed under these circumstances.  It is fair to say that each viewed the threat from an entirely different perspective.  However, these perspectives are only relevant to the extent that they inform the analysis of what a reasonable officer on the scene would have perceived.  Hatchell was focused upon the dog and viewed it as a threat because its presence could affect his own safety and could distract him from Abell, who was considered dangerous.

14

Hatchell's perspective was different than the others because the dog was either barking or growling at him and not at the others.  Finally, Hatchell's perspective was different because he did not know the dog, unlike the others.  On the other hand, it is probable that Abell and Wright's attentions during these forty-five seconds were focused on the police officers with weapons shouting commands and not on the dog.  Consequently, the perceptions of Abell and Wright regarding the threat is so vastly different from Hatchell as to be hardly relevant.

To find Hatchell liable a jury would have to reach one of two basic conclusions regarding his use of force: (1) that he should have fired more accurately at the dog; or, (2) that he should not have fired at all.[6]  The former, negligent use of a weapon, is easily resolved.  Under the pressure of the moment, Hatchell's poor aim, while raising an issue of possible negligence, does not raise a constitutional question.  The latter presents a somewhat more difficult question.  That Hatchell should not have fired means that he should have chosen another method of dealing with the dog.  Thus, the only remaining issue is whether a reasonable jury could conclude that the circumstances did not present to Hatchell objectively reasonable grounds to fire at the dog.

To impose that judgment, however, would require the jury to conclude that the unknown consequences of not shooting in rapidly-evolving circumstances would have been acceptable.  That is simply not possible.  For one thing, the Supreme Court has long counseled against assessing an officer's actions through "the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.  Rather, the assessment must be made from "the perspective of a reasonable officer on the scene .

---

[6]  Plaintiff has also argued that more extensive planning would have better prepared Hatchell to encounter a canine.  Aside from the fact that Hatchell was merely a participant in the raid and not the leader, did not make the decision to exclude a canine unit from the makeup of the task force, and was not responsible for the tactics of the raid, this allegation cannot support an excessive force claim.  An excessive force claim examines an amount of force used in certain circumstances, not preparations leading thereto.  A claim of inadequate preparation or training alleges negligence, for which the Fourth Amendment does not provide redress.

. . allow[ing] for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* The circumstances here meet that profile. Hatchell had no time for reflection as events evolved. Hatchell made a split-second judgment that the circumstances necessitated stopping the dog. He took action directly calculated at stopping the dog. Even while doing so, he evidenced care for Plaintiff's safety by simultaneously attempting to pull him out of harm's way. The Court does not suggest that a chaotic scene will insulate every use of force no matter how great. However, in these circumstances a reasonable jury could not find Hatchell's specific response to the chaos objectively unreasonable.

Moreover, the particular nature of the perceived threat in this case – a very close barking dog – makes it almost impossible to say that Hatchell's actions were objectively unreasonable. No one can know the consequences of choosing an alternative method of dealing with the dog. Sometimes, a jury can properly assess whether in the circumstances an officer could have effectively met a threat with less force. Often, hindsight – were it permissible – would make this assessment much easier. But here, not even hindsight would help. It would require pure guesswork for a jury to conclude that by doing something else Hatchell could have avoided all the consequences that he feared subjectively. The dog may have attacked Hatchell; he may have severely injured Hatchell or others; he may have done nothing at all. Because we cannot know, it is improper to say in hindsight that Hatchell was objectively unreasonable in making the split-second choice forced upon him by events beyond his control.

V.

Because no reasonable juror could find in favor of Plaintiff on the individual liability

16

claim against Hatchell, there is no basis for liability against Louisville Metro Government on the derivative claims of negligent hiring and training of its officers. There can be no municipal liability for failure to train or for an arguably unconstitutional policy, where the individual government officer committed no constitutional violation. *Bowman v. Corrections Corp. of America*, 350 F.3d 537, 545 (6th Cir. 2003) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) and *Hancock v. Dodson*, 958 F.2d 1367, 1376 (6th Cir. 1992)). "[I]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point." *Id.* at 546 (quoting *Heller*, 475 U.S. at 799). The Court concludes, therefore, that Plaintiff's municipal liability claims under § 1983 likewise fail.

The Court will enter an order consistent with this Memorandum Opinion.

cc:    Counsel of Record